JUDGE COFER
delivered the following dissenting opinion:
I entertain the highest respect for the opinions of my colleagues, and always distrust my own judgment when inclined to differ from them; but my conviction that the majority of the court has arrived at a 'wrong conclusion in *633 this case is so strong and firm, and the question involved is, in my opinion, so important, and with my views of the law of the case the consequences to be apprehended from the precedent thus established will be so grave, I have deemed it proper to place upon the record some of the reasons which have compelled me to dissent. There are irregularities in the proceeding for which, in my opinion, the judgment ought to be reversed; but as no reference is made to them in the opinion of the majority of the court, I have not thought proper to extend this opinion, which must of necessity be quite lengthy, by considering them.
A portion of the property covered by the mortgages to Green and Douglass is embraced by a mortgage executed to Guthrie, McKnight, and Bowles, March 12, 1857, to secure bonds to the amount of $500,000, a part of which remain unpaid, and the holders thereof are represented by the appellant, Joseph Patterson, the trustees all being dead. The mortgage to Guthrie and others vested them with the legal title, and Green and Douglass are, therefore, as to that part of the property, only equitable mortgagees, and Douglass is such as to the whole property.
Neither the legal mortgagees nor the beneficiaries under their mortgage, the holders of bonds thereby secured, being in possession, Douglass, the junior mortgagee, commenced suit against the mortgagor and encumbrancers prior to himself, alleging breaches of the conditions of his mortgage and also of the mortgage to Green; that the mortgagor was insolvent and the mortgaged property insufficient to discharge the mortgage debts; and praying for a foreclosure of the mortgages and sale of the mortgaged property, for the appointment of a receiver pendente lite, and that the earnings of the property be applied as the court might order.
The pleadings and evidence show that the mortgagor is insolvent, and that the mortgaged property is insufficient to *634 discharge the mortgage debts and interest; that the mortgagor has no property except that covered by the mortgages, and that its earnings have not been sufficient since the date of Douglass’s mortgage to pay the current interest on its funded debt; that at the time of making the order appealed from there were more than a half million of dollars of interest due and in arrears; that state and city taxes were largely in arrears, and that the state of Kentucky had judgments against the mortgagor for large sums due for taxes on the mortgaged property; that the funds of the mortgagor were being attached by its creditors; that the property was permitted to be and remain out of repair; that the employees were not being paid, and were mutinous and threatened to destroy the property; and finally that the floating or unsecured debt of the company amounted to the sum of about $1,709,000.
Green answered, and, reiterating the charges made by Douglass, made his answer a cross-petition against the company, and united in the prayer for a foreclosure and sale, and for the appointment of a receiver.
Upo:i the joint motion of Green and Douglass a receiver was appointed, and took possession of and operated the mortgaged property. Out of the net earnings realized from the property, while in the hands of the receiver, he was ordered to pay to the appellees, for wages alleged to be due them for labor performed for the company before the appointment of a receiver, the sum of $134,000; and from that order Green, Douglass, and Patterson have appealed.
Patterson did not unite in the motion for a receiver, and in my opinion has no right to the earnings, and I shall take no further notice of his appeal.
I am of the opinion that Green and Douglass are each entitled to a reversal of the order appealed from, upon two distinct and independent grounds, viz.:
1. They are entitled to the earnings of the mortgaged prop *635 erty while in the hands of the receiver, appointed upon their motion, by the express stipulations of their respective mortgages.
2. They are entitled to said earnings independently of any stipulations in the mortgages respecting the earnings, by the well established rules of equity as understood and enforced by courts of chancery, both in this country and in England, or at least to so much thereof as shall be necessai’y, when added to the proceeds of the sale when made, to pay their debts, interest, and costs in full.
These propositions will be discussed in the order in which they have been stated.
1. The mortgage to Green provides that upon default, such as has occurred in the payment of interest, he may, upon the written request of the holder of any bonds, in the payment of interest on which default is made, enter upon and take possession of the mortgaged property, c,'and hold, use, operate, and exercise the same.for the joint and equal benefit of the holders of all of said bonds. And upon such default and request made and possession taken, the profits arising from the -and exercise of the premises shall be appropriated by the party of the third part (the trustee) as follows, to wit: first, to the payment of the expenses of the trust, including a fair and reasonable compensation to the trustee for his services; second, if there be any sui’plus remaining, then to the payment of the interest in arx-ear on said bonds; third, if there be still a surplus, then to the payment of the accruing interest on said boixds as it falls due, and to the payment of said bonds as they shall fall due.”
Having made default in the payment of interest on the bonds secured by Green’s mortgage, the company was bound on demand to deliver to him the possession of the mortgaged property; and if that had been done the distinct stipulation is that he should be entitled to the earnings, to be applied as *636 therein expressed. Green demanded possession, but it was refused. Can it be that he and the holders of the bonds secured by the mortgage have lost the benefit of a distinct and important part of their security, because of the unjustifiable refusal of the company to perform its covenant, and that their legal or equitable rights are less than they would have been if the company had kept its promise?
It is a maxim of equity that it regards that as done -which should have been done. (Bispham’s Principles of Equity, 49.) And when a recusant party will not perform his contract according to its terms, the chancellor will, if possible, consistently with equity, put the adverse party in as good condition as he would have been in if the contract had been performed. (Shakel v. Duke of Marlborough, 4 Mad. 463.) The company having agreed to surrender possession in a named contingency, and that contingency having happened, should not the chancellor treat the earnings just as Green would have had a right to treat them if possession had been delivered in accordance with the contract? It does not seem to me to comport with the nature of equity, or with the boasted adaptability of the jurisdiction and powers of the chancellor to say that the rights of one contracting party are thus at the mercy of the other.
It has been held in a suit for the foreclosure of a mortgage, when a receiver was sought by the mortgagee upon the ground of inadequacy of security and the mortgagor’s insolvency, that it was no sufficient objection to the appointment of a receiver that the premises were in possession of a tenant of the mortgagor. “Any other view,” said the court, “would place it in the power of a mortgagor, by leasing the mortgaged property, to greatly jeopardize the security and the interests of the mortgagee.” (Keep v. Michigan Lake Shore Railroad Co., 6 Chicago Legal News, 101; High on Receivers, sec. 677.) It has also been held that the mortgagor can not defeat the mortgagee’s right to the rents and profits of mortgaged prop *637 erty pending a foreclosure suit, even by a previous alienation of the equity of redemption (Lofsky v. Mauger, 3 Sandford Ch. 69), and that the right of the mortgagee to the rents and profits can not be defeated by the bankruptcy of the mortgagor and a sale of the equity of redemption by his assignee. (Post v. Dorr, 4 Edw. Ch. 412.)
In all these cases the rights of third parties, with an interest in the property, had intervened before the commencement of proceedings to obtain the appointment of receivers; yet those rights were held subordinate to the rights of the mortgagees. It seems to me, therefore, that if a prior sale by the mortgagor for value can not defeat the rights of a mortgagee to rents and profits of mortgaged property when subsequently in the hands of a receiver pending foreclosure proceedings, it can not be possible that such right, when expressly given by contract, can be defeated by the mere refusal of the mortgagor to perforin his covenant to the mortgagee.
The mortgage to Douglass provides “that in the event the said party of the first part shall fail for the space of ninety days to pay the semi-annual interest due on said bonds, as and when the same may become due, after presentation and demand thereof, then and in that case all of said bonds shall become due and payable, and the lien hereby created may be enforced for the whole debt. If the party of the first part shall fail to pay the interest for the space of time aforesaid, . . . the trustee shall, on the written request of the holders of a majority of the bonds herein secured, take possession of the property and franchises herein mortgaged, and by himself or agent, or by the receiver of a court, use and operate the same, and receive the earnings and income therefrom, or said trustee in such case may, by the decree or judgment of a court having jurisdiction, have all the mortgaged property and franchises sold and conveyed. What may be received by the trustee or receiver from income and earnings and the proceeds of the sale shall be *638 applied as follows.” Then follow stipulations as to the particular application of the income, earnings, and proceeds of sale.
The first is, that the expenses of the trust shall be paid; and the second, that the residue shall be applied “to the payment of outstanding mortgage debts upon said property according to their priorities.”
Douglass was not bound to demand possession. He had the right to do so, or to apply to a court having jurisdiction for the appointment of a receiver, and in the event he should choose the latter course, his mortgage expressly provides that he shall be entitled to the earnings which come to the hands of the receiver.
It is not pretended if the company had surrendered to him as it was bound to do if he had demanded possession, that he would not have been entitled to the earnings, to be applied as stipulated in the mortgage; but, on the contrary, this is tacitly admitted. He chose the alternative right, and asked to have the property surrendered to the receiver; and the parties having contracted that, whether he pursued the one course or the other, his rights should be the same, the chancellor has no right to say they shall be different.
But it is said that Douglass “elected to enforce his alternative right of having the mortgaged property sold and conveyed by the judgment of a court of competent jurisdiction, and the receiver he asked for pending the litigation is not his special contract receiver, but such as courts of equity always appoint when a proper case is made out by a mortgagee in an action to foreclose Or enforce his mortgage and subject the mortgaged property to the payment of his debt.”
I do not know that the receiver was not appointed for the purpose of carrying into execution the very letter of the mortgage to Douglass. The mortgage was made the foundation of the suit, and there is nothing to indicate that it was not the *639 purpose of Douglass to apply for sucb a receiver as is mentioned in the mortgage; and there is, in my opinion, no ground for saying that in appointing the receiver the court did not act in view of the stipulations in the clause providing for taking possession by “the receiver of a court.”
Nor am I aware that there is a distinction between “a special contract receiver” and such a receiver as courts of equity always appoint when a proper case is made out. Parties may contract for the appointment of a receiver in a given contingency, and when that contingency happens the chancellor will appoint a receiver just as he will specifically enforce other lawful contracts. But a receiver appointed under such a contract will still be the receiver of the court, and amenable to its orders just as in other cases (Keep v. Railroad Co., 6 Chicago Legal News, 102); and there is no doubt but the parties so understood and intended. They did not contemplate the appointment of a receiver for the purpose of receiving the possession of the property from the company, or intend that when put into possession he should become independent of the court and operate the roads under the directions of the trustee. That such was not their meaning or intention is made plain by the following language of the mortgage:
“What may be received by the trustee or receiver from income and earnings, and the proceeds of sale, shall he applied as follows.” This language shows that the receiver contemplated by the contracting parties was one to be appointed in a suit to enforce the mortgage by a sale and conveyance of the mortgaged property, such a one “as courts of equity always appoint when a proper case is made out by a mortgagee in an action to foreclose his mortgage.”
The object of the stipulations quoted, and their legal effect, as between the parties, can not be misunderstood. They were inserted to strengthen the security by furnishing the mortgagees with the means of reaching and subjecting the earnings when *640 ever that course should, be rendered necessary for their more complete indemnity.
When the contingency happened upon which they were to become entitled to the earnings, it was the legal duty of the company to surrender the property upon the demand of either Green of Douglass. Each had a right thenceforward to the eai’nings if he sought them in the mode pointed out in his contract, or in a mode recognized by the rules of equity; and each having thus sought them, I can not understand upon what principle of law, equity, or morals they are to be denied that which both contracting parties certainly intended to secure, and thought they were securing to the mortgagees.
I am therefore of the opinion that upon the plain stipulations of their respective mortgages Green and Douglass are entitled to have the order appealed from reversed.
2. Having disposed of my first proposition, which I regard as not of vital importance, I come to the consideration of the second, of the correctness of which, with all deference to my brothers, I entertain no doubt; and in its discussion I shall leave out of view, as immaterial, the stipulations for the surrender of possession, for the appointment of a receiver, and in regard to the receipt and application of the earnings, and treat the question as though both the mortgages were silent upon these subjects. I maintain, then,
First. That although (unless the former rule on the subject has been changed by statute, of which I shall presently have something to say,) the appointment of a receiver rests in the sound discretion of the court, the discretion meant is judicial and not arbitrary, “and is always to be exercised under certain well-established rules;” and that when a case is made out which falls within those rules it is the duty of the chancellor to make the appointment; and—
Second. That when a case is made out, and a receiver is appointed, those upon whose application he is appointed acquire *641 a specific lien upon the earnings or income from the mortgaged property which come to the hands of the receiver under that appointment, of which they can not be lawfully deprived, except by the payment of their debts in full.
1. That the discretion of the chancellor “is always to be exercised under well-established rules” is established by many authorities. (Bispham’s Principles of Equity, sec. 577.)
“Whenever it appears from the bill, the answer, or the testimony at the hearing that a receiver is necessary, the court will appoint one.” (Tomlinson v. Ward, 2 Conn. 403.)
In Mays v. Rose (1 Freeman, 718) the court said a reference to the various decisions upon motions for the appointment of receivers throws but little light upon new cases, “ except so far as they establish the general principles which should govern the court in the exercise of its discretion upon these motions. These principles are: That the plaintiff must show, first, either that he has a clear right to the property itself, or that he has some lien upon it, or that the pi’operty constitutes a special fund to which he has a right to resort for the satisfaction of his claim; and, secondly, that the possession of the property by the defendant was obtained by fraud, or that the property itself, or the income arising from it, is in danger of loss from the neglect, waste, misconduct, or insolvency of the defendant.” And the court cites Orphans’ Asylum v. McCartee, 1 Hopkins, 429; Hugonin v. Basely, 13 Ves. 105; Loyd v. Passingham, 16 Ves. 60, in support of the views expressed. See also to the same effect Haight & O’Connell v. Burr, 19 Md. 130; Williamson v. Wilson, 1 Bland, 418; Blondheim v. Moore, 11 Md. 364.
That the court ought always to be governed by established and fixed rules, based upon equitable principles, in deciding upon motions for the appointment of receivers, especially in suits to foreclose moi’tgages, is also established by the cases hereafter cited, in which receivers were appointed on motion *642 of mortgagees against purchasers, junior mortgagees, and creditors in possession by means of an equitable sequestration.
A mortgagee whose mortgage does not embrace the earnings of the mortgaged property has no claim to such earnings as long as the property remains in possession of the mortgagor, or of any one holding under him. The mortgage being treated, as is always done in equity, as a mere security for the debt, as long as the mortgagor retains possession he does so as owner, and is entitled to the earnings as an incident to his ownership. But when the conditions of the mortgage have been broken he holds possession at the will of the mortgagee. Such a mortgagee is not entitled, by the rules of equity, to have a receiver appointed, for the obvious reason that he has a complete and effectual remedy at law by an action of ejectment for the recovery of possession, and once in possession he can receive the earnings. These are general 'principles, with which every jurist is familiar, and it is not deemed necessary to encumber this opinion by citations of authority to support them.
If, however, there is a prior unsatisfied mortgage covering the property, and the mortgagee applying for a receiver has, therefore, but an equitable mortgage, he is without remedy at law; and if he desires to secure the earnings of the mortgaged property, he must go into a court of equity and ask for the appointment of a receiver. Not having a legal right to possession, he must make out grounds for equitable relief; and it is at this point the question arises, what facts must he exhibit in order to show his equitable right?
As he must make out his case by affirmative matter, the first inquiry is, is thei’e a necessity for the intervention of the court? and this involves two further questions, viz., (1) is the mortgaged property adequate security for the debt? and if not (2) is the mortgagor or other person personally liable therefor solvent ?
If either of these questions be answered in the affirmative, *643 there is no necessity for the appointment of a receiver, and therefore none will be appointed.
An equitable mortgagee must, therefore, show, first, that the mortgaged property is probably insufficient to satisfy the debt; and, second, that the mortgagor is unable to make good the deficit.
When these facts are made to appear there is a case for a receiver. (Kerr on Receivers, pp. 49, 50.)
“Stated in general terms, the well-established rule, deducible from the clear weight of authority, is that in all cases where the rents of the property are not specifically pledged for the security of the debt, to entitle the mortgagee to a rereiver of the mortgaged premises, and of the rents and profits, he must show — first, that the property itself is an inadequate security for the debt, with interest and costs of suit; and, second, that the mortgagor or other person who is personally liable for the payment is insolvent, or beyond the jurisdiction of the court, or of such doubtful responsibility that an execution against him for the deficiency would prove unavailing. And this being shown, the courts will generally interpose and appoint a receiver.. And it has been held that the aid of a receiver should be granted or withheld according as it may or may not be an essential means to pay the indebtedness secured by the mortgage; and there can be no necessity for the relief if the mortgagor is solvent and able to pay any deficiency .” (High on Receivers, secs. 666, 376; Brown v. Chase, Walk., Mich., 43; Warner v. Gouverneur’s ex’rs, 1 Barb. 36; Quincy v. Cheesman, 4 Sandf. Ch’y, 405; Ruggles v. Southern Minnesota R. R. Co., U. S. Cir. Ct., 5 Chicago Legal News, 110; Keep v. Michigan Lake Shore R. R. Co., 6 Ibid. 101.)
I have been unable to find a single case, and do not believe one can be found, except in the state of New Jersey, where the equitable doctrine respecting receivers in aid of junior mortgagees never obtained, in which an equitable mortgagee *644 has been refused a receiver when he was able to show that the mortgaged property was probably an insufficient security and that the mortgagor was insolvent.
In Astor v. Turner (11 Paige, 337) Chancellor Walworth held that under such circumstances the mortgagee was entitled to a receiver as a matter of right, and that, too, as against a third person who was the owner of the equity of redemption.
In Howell v. Ripley (10 Paige, 43) a receiver was appointed on the application of a third mortgagee against a purchaser of the equity of redemption in actual possession of the mortgaged premises, and the right of the mortgagee to that relief was not questioned, and was treated as if unquestionable.
In Post v. Dorr (4 Edward’s Ch’y, 412) the mortgagor was a bankrupt; his equity of redemption in the mortgaged premises passed to his assignee, and was sold to a third person; yet a receiver was appointed upon the application of a mortgagee, although the appointment was resisted.
In Lofsky v. Mauger (3 Sand. 69) the mortgagor sold the equity of redemption to a third person, who took possession. While the purchaser was in possession a second mortgagee applied for a receiver. The court said: “It is well settled that in a case like this the court of chancery will appoint a receiver of the lands mortgaged, and will restrain the mortgagor or his grantee from collecting the accrued rents. This is clearly the effect of what the chancellor held in the case of Rowell v. Ripley (10 Paige, 43).”
In the case of Keep v. R. R. Co. (6 Legal News, 101) a tenant of the mortgagor was in possession, but a receiver was appointed, notwithstanding his objections.
“The court will grant a receiver at the instance of a second encumbrancer in all cases in which the first encumbrancer is not in possession.” (2 Daniell’s Chancery Practice, 1718, 1719.)
In Insurance Co. v. Stebbins (8 Paige, 566) Chancellor *645 "Walworth went even farther, and held that if the petition showed a ease for a receiver the plaintiff had a right to have one appointed if there was a reasonable doubt whether the mortgaged property would sell for enough at a master’s sale to satisfy the mortgage debt.
By a very ancient and well-established rule of chancery practice a judgment-creditor, having a return of nulla bona, might apply to the chancellor for the appointment of a sequestrator to take possession of such estate of the debtor as could not be reached by execution at law, and receive the rents and profits, and apply them to the satisfaction of the judgment. In several reported cases of that character the property in the hands of sequestrators was covered by equitable mortgages, and in every such case to which I have had access a receiver was appointed when applied for by an equitable mortgagee, and the sequestrator was compelled to surrender to him, which could only have been the case on the assumption that the equity of the mortgagee was superior to that of the unsecured judgment-creditor. (2 Daniell’s Chancery Practice, 1059; Shaw v. Wright, 3 Vesey, 22-24; 2 Madd. Chancery Practice, 473; Attorney General v. Mayor, &c., of Coventry, 1 Peere Williams, 306; Walker v. Bell, 2 Madd. Rep. 21.)
In Walker v. Bell a decree had been obtained against Bell for a large sum, and a commission of sequestration was issued against his estate commanding the commissioners “to enter upon all the messuages, lands, tenements, and real estate of the defendant, and to collect, take, and get into their hands not only the rents and profits of said estate, but also all his goods, chattels, and personal estate, and retain and keep the same under sequestration in their hands until the defendant should pay the sum of £2,889 6s 7cl into bank, clear his contempt, and the court should make an order to the contrary.”
The commissioners seized the whole of the defendant’s estate, after which two mortgagees of the estate presented their *646 petitions that they might receive the rents to be applied to their mortgage debts, and it was ordered accordingly.
White v. The Bishop of Peterborough (3 Swanston, 109) and Silver v. The Bishop of Norwich (Ibid. 112) were both cases in which sequestrators were in possession to receive the rents and profits of the estates of judgment debtors for the satisfaction of the judgments. In each of those cases a bill was filed by equitable encumbrancers for the appointment of receivers of the rents and profits to be applied to the payment of the lien debts, and in each case receivers were appointed and the sequestrators turned out. Those cases were decided by Lord Eldon, the latter in 1816 and the former in 1818.
These authorities show that the right of an equitable mortgagee to a receiver of the rents and profits of the estate mortgaged is superior to the rights of purchasers of the mortgagor’s equity of redemption (Astor v. Turner, 11 Paige, 337; Howell v. Ripley, 10 Ib. 43; Post v. Dorr, 4 Edw. Ch. 412; Lofsky v. Mauger, 3 Sandford, 69); to the rights of a tenant of the mortgagor (Keep v. R. R. Co., 6 Legal News, 101); and to the rights of judgment creditors in possession by sequestration (2 Daniell’s Ch. Pr. 1059; 3 Vesey, 22; 2 Madd. 473; 1 Peere Williams, 306; 2 Madd. Reps. 21).
Purchasers have a higher equity than creditors, and in the cases in which the vendees and tenants of a mortgagor -were turned out that a receiver might be put in for the benefit of mortgagees it was decided that the equity of the mortgagees was superior to that of purchasers, and a fortiori the equity of mortgagees is superior to that of unsecured creditors.
Surely if the accident that one creditor had security and the other had none gave the latter a right to demand that the maxim that ‘"‘"he who seeks equity must do equity” should be enforced, the cases cited afforded most excellent opportunities for its application; but no such suggestion seems to have been made.
*647 The judgment creditors of insolvent mortgagors not only-had just debts, but they had reduced them to judgment, and had proceeded with the execution of their respective judgments so far as to get into possession, by sequestration, of their debtors’ estates, with the judgment of the court empowering them to receive the rents and profits and apply them to the payment of their debts. They had been diligent, and were in a position to ask'all that the chancellor, who delights to favor the vigilant, could give them. But before they had reduced the rents and profits to possession the mortgagees asserted their rights, which were recognized in two instances by the lord-chancellor and in one by the vice-chancellor as superior to the rights of judgment creditors in possession.
Many other authorities to the same effect might be cited, but it would seem that these are sufficient, especially. as no single case has been cited in which a receiver has been refused to a second mortgagee when the mortgagor was shown to be in possession and insolvent; and it was also shown that the mortgaged property was probably insufficient to pay the mortgage debt. The cases cited in which third persons, purchasers from the mortgagor, were in possession with an interest in the mortgaged property, put the rights of the mortgagee to the rents and profits to a severe test; yet they were always held paramount to the claim of even purchasers for value. Surely a purchaser for value has a higher equity than a simple contract creditor, who has no interest in nor lien upon the property, the profits of which form the subject of controversy. But the doctrine goes even further. There are numerous instances in which a subsequent mortgagee, in possession by himself or by a receiver, has been turned out upon the application of prior mortgages. (2 Powell on Mortgages, 799, notes 4 and 5.)
Having, as I think, shown that although by the rules of equity practice the appointment of a receiver is a matter of discretion, it is a judicial and not an arbitrary discretion, and *648 is always to be governed by well-established rules, and that one of these rules is and has been, even where there is no statute governing the subject, to appoint a receiver whenever applied for by an equitable mortgagee, the mortgagor being in possession and insolvent, and the mortgaged property an inadequate security, I proceed to the inquiry whether the discretion formerly existing has been affected by statute.
2. Section 329 of the Civil Code provides that “in an action by a mortgagee for a foreclosure of his mortgage and sale of the mortgaged property a receiver, may in like manner be appointed where it appears that the mortgaged property is in danger of being lost, removed, or materially injured, or that the condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt.”
Even if before the adoption of this statute the chancellor possessed the discretion claimed for him, he no longer possesses it. It is true the language is, “ a receiver may be appointed.” But upon both principle and authority its meaning is the same as if it read, “a receiver shall be appointed.” If the mortgaged property is probably insufficient to discharge the mortgage debt, and the condition of the mortgage has not been performed, there is ground upon which to apply for a receiver. What, in such a case, is the object of having a receiver appointed ? Manifestly to enable the mortgagee to reach the income arising from the mortgaged property. If this be not the purpose, then the statute is a delusion and a snare. What motive to apply for a receiver, if no right is thereby acquired to the earnings or income arising from the property? Did the legislature mean to authorize a mortgagee whose debt is insecure because his security is insufficient to apply for and obtain a receiver, and then leave it to the mere uncontrolled and uncontrollable discretion of the chancellor whether any benefit shall be derived from the appointment or not?
*649 In his treatise on the Construction of Statutes (p. 220) Mr. Dwarris says: “ Where a statute directs the doing of a thing for the sake of justice, the word may means the same as the word shall.” Judge Potter, in a note upon the above text, says: “May, in a statute, means must whenever third persons or the public have an interest in having the act done which is authorized by such permissive language.”
In Alderman Bachman’s case (1 Vern. 152) application was made by a few creditors for a commission of bankruptcy. It appeared that the alderman had effected a composition with by far the larger part of his creditors, and that he offered to the other creditors that their debts should be paid in full, one fifth in ready money and the other four fifths in assignments on the exchequer. It also appeared that the creditors who had accepted the composition had received their money, and that the appointment would overreach the composition and subject those creditors to the danger of losing their debts.
“The Lord Keeper (North) declared that though the words in the act of Parliament were that the chancellor may grant a commission of bankruptcy, yet that may was in effect must, and it had been so resolved by all the judges; and the granting of a commission was not a matter discretionary in him, but that he was bound to do it, and that he had done the aider-man already what kindness he could, in that he refused to grant a private seal for the passing of this commission; but that now he could deny it no longer by reason of the prejudice and hazard that the creditors might in this case sustain by delays; and as for what was said, that much the greater part of the creditors had already submitted to a composition and had delivered up their specialties, and now this commission would overreach them and they would be in danger to lose their debts.” He said “ he could not help that if it should so fall out.”
Here was a strong equity against the action the chancellor was asked to take, and certainly he would have been warranted *650 in that case, if a court can ever be in any case, to refuse to act at the instance of a party who has made out a case because his action may affect the interest of third persons. But the rule of law was that may was in effect must, and therefore the granting of the commission was not a matter of discretion with the judge, but he was bound to do it.
Lord Hardewick said in Attorney General v. Lock (3 Atk. 166) “the words shall and may in general acts of parliament, or in private constitutions, are to be construed imperative.” The same doctrine was held by the same great judge in Stamper v. Miller (3 Atk. 212.)
In Regina v. Tithe Coms. (14 Adolphus & Ellis, 459) the Court of Queen’s Bench said “ it had been so often decided as to have become an axiom that in public statutes words only directory, permissory, or enabling, may have a compulsory force where the thing to be done is for the public benefit or in advancement of a public justice.”
“When a statute confers authority to do a judicial act in a certain case it is imperative on those so authorized to exercise the authority when the case arises, and its exercise is duly applied for by a party interested and having a right to make the application; and that the word may is not used to give a discretion, but to confer a power upon the court or judges; and the exercise of such power depends not upon the discretion of the court or judge, but upon the proof of the particular case out of which such power arises.” (McDougall v. Patterson, 11 Com. Bench, 772.)
Other English cases might be cited, but it is unnecessary; these are enough to show how the courts of the country from which Ave derived our system of jurisprudence construe statutes like the one under consideration. Let us, then, inquire what rule the courts of America have established on the same subject.
In Newburg Turnpike Co. v. Miller (5 Johnson’s Ch’y, *651 113) Chancellor Kent said “the principle to be deduced from the case is, that whenever an act to be done under a statute is to be done by a public officer, and concerns the public interests, or the rights of. third persons, which require the performance of the act, then it becomes a duty in the officer to do it.”
And he quotes with approval Alderman Bachman’s case, supra; and King v. Barlow (2 Salk. 609); and King v. Inhabitants of Derby (Skinner, 370), in which the doctrine stated was recognized as correct.
In Supervisors v. United States (4 Wall. 435) a statute provided that the board of supervisors “may, if deemed advisable, levy a special tax,” etc. The supreme court said: “ The conclusion to be deduced from the authorities is, that where power is given to public officers in the language of the act before us, or in equivalent language, when the public interest or individual rights call for its exercise, the language used, though permissive in form, is in fact peremptory. What they are empowered to do for third persons the law requires shall be done. The power is given not for their benefit, but for his. It is placed with the depository to meet the demands of right, and to prevent a failure of justice. It is given as a remedy to those who are entitled to invoke its aid, and who would otherwise be remediless.
In the City of Galena v. Amy (5 Wallace, 705) the same doctrine was recognized.
In the Mayor, &c. v. Furz (3 Hill, 612) Chief Justice Nelson said: “ Where a public body or officer has been clothed by statute with authority to do an act which concerns the public interests, or the rights of third persons, the execution of the power may be insisted on as a duty, though the phraseology of the statute be permissive merely, and not peremptory.”
If authorities are worth any thing, these would seem to leave no escape from the conclusion that under our Code it is *652 the duty of the chancellor, upon its being made to appear in a suit to foreclose a mortgage that the conditions thereof have not been performed, and that the mortgaged property is probably insufficient to discharge the debt, to appoint a receiver. Both these facts are shown in this case, and the chancellor was, in my opinion, as much bound to appoint a receiver as he will be upon final hearing to render a judgment directing the property to be sold for the satisfaction of the debts secured by the mortgages.
I come then to consider the effect of the appointment upon the rights of the parties to this appeal.
Much is said in the books upon the question whether a receiver is to be treated as peculiarly the receiver of him upon whose motion he was appointed, or of the party who shall finally prevail in the action. And from this, as I think, some confusion has arisen as to the effect of the appointment of receivers in foreclosure proceedings.
Lord Hardewick said the appointment of a receiver “ was for the more speedy getting in of the party’s estate, and securing it for the benefit of such persons who shall appear to be entitled, and does not at all affect the right.” (Skipp v. Harwood, 3 Atk. 564.) But the case shows that it was one in which the title to the thing in the receiver’s hands, and not its profits, was in controversy.
And it is with reference to that class of cases that this and similar remarks of judges and law writers have generally, if not always, been used. (2 Daniell’s Ch’y Pr. 1716; 2 Madd. Ch’y Pr. 231-2; Kerr on Receivers, 163.)
When, therefore, it is said that the appointment of a receiver is not for the benefit of the plaintiff merely, but for all who may establish rights in the cause, and that money in the hands of a receiver is in custodia legis for whoever can make a title to it (Kerr on Receivers, p. 161; 2 Daniell’s Ch’y Pr. 1716, and note 2), care should be taken not to be misled by it when *653 we come to consider cases in which there is no dispute about the principal thing in the receiver’s hands, but only as to the right to its issues and profits.
That a receiver appointed in a suit for the foreclosure of a mortgage and sale of the property is the receiver of him upon whose motion he was appointed, is established by every case of the kind to which I have had access, except the case of Beverly v. Brooks (4 Grattan).
The books contain many cases in which junior encumbrancers have obtained the appointment of receivers, and a subsequent contest arose between them and prior encumbrancers in respect to the rents and profits, and in every instance, as far as I have been able to discover, except the one above referred to, it was held that he upon whose motion the receiver was appointed was entitled to all the rents and profits which came to the hands of the receiver under that appointment, and that the only way in which even a prior mortgagee can reach the rents is by applying to the court, and having the receivership extended so as to embrace his encumbrance.
If, then, I show that if Green had not united with Douglass in the motion for a receiver, and the appointment had been made on the motion of Douglass alone, that Douglass would have been entitled to the earnings realized while the receiver was in possession under his appointment, to the exclusion of Green, I think I will also have shown that Green and Douglass are entitled to them to the exclusion of the appellees. Surely it will not be denied that if Douglass could, under that state of case, hold the earnings against Green, he and Green may hold them against the appellees.
“The general rule is that a junior mortgagee who obtains a receiver of the rents and profits in aid of a bill to foreclose his mortgage, is entitled to the rents and profits at the hands of the receiver up to the time of appointing a receiver upon a bill by a prior mortgagee, not a party to the original suit; and *654 the prior mortgagee is only entitled to have of the receiver such rents and profits as accrue after the appointment in aid of such prior mortgagee, although one and the same person be appointed in both cases. The rule is based upon the consideration that until the elder mortgagee sees fit to assert his rights to the rents and income, a junior encumbrancer has a right to do so; and the first mortgagee not being a party to the suit, and having no lien on the rents and profits, and no right to recover the back rents, he can only assert his right thereto, as against the receiver, from the date of appointment in his own suit. . . . (Sanders v. Lord Lisle, Ir. Rep., 4 Equity, 43.) In such case the extension of a receiver is regarded as a new appointment, and the rents theretofore received by him are treated as by-gone rents which the mortgagee last asserting his right has suffered other claimants to realize, and the order extending the receiver for the benefit of the prior mortgagee will attach only to the rents thereafter received.” (High on Receivers, sec. 688; Agra & Masterman’s Bank v. Barry, Ir. Rep., 3 Equity, 443; Lanauze v. Belfast, Holywood & Bangor R. R. Co., Ibid. 454; 2 Daniells’s Ch’y Pr. 1718.)
This rule, Mr. High says, is sustained by the clear weight of authority, and a somewhat extended examination of the authorities leads me fully to concur in that conclusion.
Judge Redfield says: “"Where there are different mortgagees, and the first mortgagee does not assume possession of the property or take any steps toward a foreclosure, any subsequent encumbrancer may take possession or have a receiver appointed to hold the rents, issues, and profits for his benefit until those who have a prior right claim them by some definite action in that direction. But where the prior mortgagee takes proceedings to enforce his lien the same receiver will be appointed in his suit, which is, in fact, but an extension of the receivership so as to include the prior mortgage and suit; and the subsequent encumbrancer will not be obliged to *655 refund any rents received by himself before the prior encumbrancer took possession or brought suit.” (Redfield on the Law of Railways, vol. 2, sec. 224, subsec. 7; Caggee v. Howard, 1 Barb. Ch. 368.)
The long and well established rule of the English chancery is that the appointment of a receiver at the instance of a junior is always made without prejudice to the rights of the elder mortgagee. (2 Daniells’s Ch. Pr. 1715.)
When a receiver has been appointed at the instance of a junior mortgagee, the elder mortgagee may take either of two courses. He may demand that the possession shall be surrendered to him, or he may come in and be examined pro interesse suo and ask the benefits of the receiver. And if, after a receiver has been appointed, he will not avail himself of his legal right, he will not be entitled to the benefit of the receiver. (Ibid. 1718; 6 Ves. 287; Brooks v. Greathead, 1 J. & W. 178; see also Hunt v. Priest, 2 Dick. 540.)
This view is not only established by the authorities, but is sustained by sound reason. As before remarked, the sole object in providing for the appointment of a receiver is to enable the mortgagee to intercept the rents and profits of the mortgaged property for the better security of his debt, and this purpose of the law would be subject to be entirely defeated by the establishment of the rule that the rents and profits which come to the receiver’s hands may be disposed of at the discretion of the chancellor to third persons who had no agency in the appointment, and especially to those who have no claim to or lien upon the mortgaged property. I repeat, why give to a mortgagee a right to a receiver because his security is insufficient, if he does not acquire a right in preference to other creditors to the rents and profits of the mortgaged property?
Again: so long as the mortgagor or any one holding under him remains in possession, the mortgagee has no claim to the rents and profits when not specifically pledged. When, there *656 fore, a junior mortgagee intercepts the rents by procuring a receiver, he reaches that which belongs to the mortgagor and would otherwise have gone to him, and to which prior mortgagees and unsecured creditors of the mortgagor have no more claim than to any other estate or effects of the common debtor. Prior mortgagees and unsecured creditors having no claim upon or interest in the rents and profits, the junior mortgagee having had a receiver appointed, prior mortgagees and co.mmon creditors have no more legal or equitable right to intervene and have rents and profits coming into his hands under that appointment applied to their debts than they would to have so applied the proceeds of any other property of the mortgagor which the junior mortgagee had secured by his superior diligence in the use of legal or equitable process.
In order to make myself the better understood, suppose the mortgagor had leased its roads, and the tenant was in possession and no receiver had been applied for. In that case the mortgagor would have been entitled to the rent up to the day of a sale under judgment of foreclosure. If Green and Douglass had in that case attached the rent in the hands of the tenant, their right to have it applied to pay the bonds secured by their mortgages could not be questioned by the appellees or by a prior mortgagee. In that case Green and Douglass would have reached and subjected the mortgagor’s effects by legal process. But having secured a receiver, they, by equitable process, intercepted the income from the roads which would otherwise have gone to the mortgagor.
The right to income coming to the hands of a receiver is, in my opinion, as absolute and complete in those upon whose motion the receiver was appointed as the right of an attaching creditor to the fund attached. Both are recognized lawful modes of reaching the estate of the debtor and subjecting it to the payment of his debts, the only difference being that, any creditor may proceed by attachment, and any estate of the *657 debtor not exempt from seizure for debt may be reached in that way, whereas only the rents and profits of the estate in lien can be reached through a receiver in a foreclosure suit, and then only by a mortgagee or other lienholder.
Having shown, as I think, that a junior mortgagee upon whose motion a receiver is appointed is entitled, as against a prior mortgagee, to the rents and profits which come to the receiver’s hands under that appointment, it seems hardly necessary to enter into an extended argument to prove that he has the same right as against creditors who have no lien upon or interest in the mortgaged property by which the fund in the receiver’s hands was earned.
"The appointment of a receiver does not give a mere stranger to the suit the benefit of the proceedings, so that he may claim what he would not otherwise be entitled to.” (High on Receivers, sec. 13; Howell v. Ripley, 10 Paige, 43.)
It is clear that these appellees were not only strangers to the suit, but were unnecessary, and would have been improper parties; and if made parties to the original suit, might have gone out on demurrer. They neither had an interest in the property nor in its earnings or proceeds. If they have any rights they acquired them through a suit to which they were not parties, that was not brought for their benefit, and in the subject-matter of which they had no possible legal or equitable interest. And they have not only thus strangely acquired an interest where they before had none, but that interest has been adjudged prior and superior to the interest of those whose prior legal and equitable rights enabled them to secure for the appellees that which the appellees could never have secured for themselves. They could not have obtained the appointment of a receiver, and therefore never could, through any right in themselves, have obtained that which has been adjudged to them. The appellants had a right to a receiver and obtained one, but the appellees have the benefits of his appointment. *658 In other words, the appellants had the right and obtained and put in motion a recognized remedy with a view to their own relief; the appellees had no right and consequently no remedy. One would have supposed that under such circumstances the appellants would have obtained relief and that the appellees would not. Such, however, is not the fact. Appellants still have their right and their remedy, but no relief; while the ap- , pellees have relief, without either right or remedy in themselves. There is no privity of contract or of estate between the appellees and appellants; and how it comes to pass that with the right and remedy in one, relief is decreed to the other, I confess I am unable to comprehend.
If the mortgaged property shall, as no one can doubt it will, sell for less than will satisfy the mortgages and other liens prior to the mortgage to'Douglass, the holders of bonds thereby secured or attempted to be secured will lose their whole debt; while these appellees, without liens upon either the property or its earnings, and without a remedy in themselves by which they could have reached either, will be paid in full.
Douglass is bound for the costs of the suit and of the receiver, and in the contingency just supposed, of a sale of the property for less than the prior encumbrances, will get nothing; while the appellees, who never became liable for the costs, who took no trouble or risk in procuring a receiver, and had no pretense of right to a receiver, get their entire debts without one dollar of legal costs.
A decision producing, or that may produce, such a result seems to me to overturn the very foundation of contract rights, and virtually to destroy all securities in the form of liens upon property, and to convert an intended benefit, attempted to be secured by solemn contract of which the world had notice, into a positive disadvantage, and to make the lack of all attempt to provide a security by contract the very best- possible security, through a supposed discretion of the chancellor.
*659 Sucb a conclusion is not the offspring of any recognized or even of an asserted principle of equity. No rules or principles are laid down as conducting to a result so anomalous. It is simply said that the chancellor has a discretion to appoint a receiver or not when applied to for that purpose, and that in this instance there was no abuse of discretion in so modifying the order of appointment as to require him to pay out of the earnings of the mortgaged property debts due to persons having no contract, or legal or equitable lien on the fund, to the exclusion of those having a lien on the property producing it, and who, it is decided by the majority of the court, have prima facie an equitable claim to the whole fund, and at whose instance the. receiver was appointed to rescue it from an insolvent and unfaithful corporation.
Rights depending upon the discretion of courts are not the most valuable. They can never be measured; their extent and value are unknown, and are incapable of being ascertained.
It is conceded that grounds were made out for the appointment of a receiver. In other words, that the appellants showed that the mortgaged property was “ probably insufficient to discharge the mortgaged debts,” and therefore the chancellor should have appointed a receiver.
But, although he should have done so, yet he had a discretion not to do it, or to do it upon condition that $134,000 to come to the receiver’s hands from the earnings of the property should be paid out to unsecured creditors.
In the opinion of the majority of this court, that was not an abuse of the discretion said to be possessed by the chancellor; but it is intimated that the chancellor may go too far, and that he may not be permitted to pay all the unsecured creditors of the mortgagor out of the earnings to the exclusion of the mortgagees. What principle marks, or even remotely and dimly indicates, the boundary line of the chancellor’s discretion? What legal or equitable distinction is there between the *660 claims of these appellees and the claims of other unsecured bona fide creditors?
It is said the services of the appellees were devoted to constructing, repairing, and operating the mortgaged roads; that they were necessary for those purposes, and that they preserved the property and enabled the debtor company to retain its good will and the public confidence up to the time at least when the workmen and laborers are alleged to have become demoralized by the continued non-payment of their wages.
Other unsecured creditors may have furnished material and supplies as necessary in operating the roads and in enabling the debtor company to retain its good will and the public confidence as the labor of the appellees. Shall they, also, be paid out of the earnings in the hands of the receiver? And, if not, why not? What is the principle distinguishing the two classes of creditors and allowing the chancellor to pay the one and forbidding him to pay the other?
If the right to payment out of earnings which come to the hands of the receiver is to turn upon the question whether that which the creditor did for, or furnished to, the company, was devoted to constructing, repairing, and operating the mortgaged roads, or was efficient in enabling it to retain its good will and the public confidence, then it would be proper to go into an inquiry as to the use made of the money borrowed from the bondholders, and to show that it was used to build the road superstructure, to buy iron and rolling-stock, and other things, without which there would have been no road to repair or operate, and no good will and public confidence to retain; and then the chancellor would be called upon to exercise both his ingenuity and discretion in deciding whether, as matter of law, it was more beneficial to the company, or more meritorious in the claimant, to have furnished money to build, equip, and stock the road, or labor to keep it in repair and operation.
A careful examination of many authorities, and the most *661 mature reflection I have been able to give to the subject, have not enabled me to perceive any principle, or to discover a single authority, for discriminating between creditors on account of the fact that the debt of one is for money loaned, and the other for labor performed. Such creditors stand as equals before the law, and controversies between them as to priority of payment out of the estate of their common debtor should be decided otherwise than by an inquiry into the consideration for their respective debts further than may be necessary in order to show that both are bona fide, and deserve to be paid.
But if a contrary rule is to prevail, and creditors are to be paid in the order of priority in which the court, looking to the consideration for the debt, may, in its discretion, direct, I can not avoid the conviction that the rules of law by which rights of property are to be decided will become, to say the least, exceedingly uncertain and unreliable.
The case in 107 Mass., cited as sustaining the conclusion reached by the majority of this court, was unlike this. The facts were these: The Boston, Hartford & Erie Railroad Company made a mortgage to secure its bonds for $20,000,000. Subsequently the company entered into a contract with Adams Express Company by which the latter company loaned $200,000 to the former, and the former agreed to carry certain express matter for the latter, and the consideration for carrying the freight was to be retained by the express company and credited on the loan. Before this contract was fully performed the mortgagees applied for and obtained the appointment of receivers. The receivers gave notice to the express company that they would decline to be bound by the contract, and thereupon that company applied to the court to compel them to comply with the agreement made by the railroad company. But the court held that the receivers were not bound to carry the express matter which the railroad company had agreed to carry, and if they carried it, were not bound to allow the *662 freight money to be credited on the loan made by the express company.
In considering that question the court said (p. 17): “The payment of the debts of the corporation previously contracted would be inconsistent with the nature and purpose of the office of the receivers, as with the terms of their appointment. They have no right to appropriate the property and assets of the corporation for that purpose, nor the earnings of the road while operated by them. The amounts allowed under the contract of the corporation with the petitioners (the express company) are earnings of the road, to be acquired by service requiring outlays by the receivers, and are a part of its legitimate assets as much as if due in money. By the terms of the contract they are to be applied to the debt of the corporation.
“ But that contract constitutes no lien upon the property or franchises of the corporation, and it is no more obligatory upon the receivers either to make the application or to render the service than the debt itself. To fulfill that contract in all its terms will be, in substance and in effect, to appropriate the use of the property and earnings of the road pro tanto in payment of the debt of the petitioners in preference to all others.”
Thus far the reasoning and conclusion of the court are in exact accord with the views I have already expressed.
When the opinion just quoted was rendered it had not been decided whether the mortgagees would take a judgment to sell the property, or for a strict foreclosure; and the court directed the receivers to go on with the contract, and to receive from the express company payment for carrying freight under it, or security for payment if payment should be required. In other words, the court held the fund subject to future orders until it should be ascertained whether it would be required to satisfy the mortgage debt.
Later in the progress of the case there was a judgment of strict foreclosure, a thing unknown in our practice, the effect *663 of which was to satisfy in full the mortgage debt, and vest the absolute title to the property in the mortgagees, subject only to a statutory right of redemption.
Judgment of strict foreclosure having been rendered, the court made an order directing its receivers to surrender the property to the mortgagees upon payment of their costs. The costs were paid, and the mortgagees took possession of the property as absolute owners.
The receivers then moved the court to compel the express company to pay over to them the amount of freight-money earned while the property was in their hands, in order that they might pay it over to the mortgagees, whose entire debt had been satisfied by the strict foreclosure. The express company resisted the motion, and claimed to hold the money in its hands, and apply it as a credit on the loan to the railroad company; and it was in deciding that question that the court used the language quoted by this court.
The earnings were not claimed as necessary to complete the payment of the mortgage-debt, but upon the ground that the possession of the receivers was the possession of the mortgagees, and that a mortgagee in possession is entitled to the rents, and where there is a strict foreclosure is not accountable for rents, and therefore that they were entitled to the earnings which came or should have come to the receiver’s hands.
Both the argument of counsel and the opinion of the court show that the question of the right of a mortgagee to the rents, profits, and earnings of mortgaged property while in the hands of a receiver, when necessary to satisfy the mortgage-debt in full, was not regarded as before the court, for the very obvious reason that the mortgage-debt was fully satisfied by the strict foreclosure.
Counsel for the receivers, in his argument, said (p. 22): “The receivers were appointed at the instance of the mortgagees, and for their benefit, and the mortgagees are entitled *664 to the earnings from the time of such appointment. Their title relates back to the time of such appointment.” Thus showing that they claimed the earnings on the assumption that they were owners when the earnings accrued, and that, as owners, they were entitled to such earnings, and that they did not claim the earnings as necessary to pay the mortgage-debt.
That the court did not understand them as claiming the fund as necessary to satisfy their debt is apparent upon an inspection of its opinion. The court said, “Another clause in the mortgage is pressed upon our consideration;” and then, after quoting it, they continued: “Whether this provision would authorize a foreclosure and sale of the property and franchises of the corporation, for the benefit of the bondholders, without the intervention of the trustees provided for in the mortgage, and whether in such case the income from the time the receivers took possession would be treated as incident to and a part of the fund distributable to the mortgagees or bondholders we need not determine.”
It thus appears that the court expressly waived a decision of the very point involved in this case.
That is the only case cited, and I presume the only one that can be found, which is supposed to support the view taken by this court upon this part of the case.
It is decided by the majority of this court that the mortgagees “have, prima fade, an equitable claim to the whole fund” in the receiver’s hands, and that “the onus will be upon each general creditor to establish a superior right upon his part.” The appellees are general creditors, and therefore the onus is upon them to show a superior right to the fund.
There are but three modes of acquiring equities: one by the act of the parties, one by operation of law, and one by the process of the law and act of the party combined. Have the appellees acquired rights to the fund in either of these modes ? Have they contracts, either express or implied, which *665 give them liens? All admit they have not. Have they contracts to be paid out of the earnings? That is not pretended. There is no statute or rule of law or equity giving them liens, and they have not acquired even inchoate liens by attachment or other process against the fund. What then is the foundation of their right to intervene between the appellants and the relief they sought, and to appropriate the earnings in the hands of the receiver, to which it is decided the appellants have a prima facie equitable claim? How have they shown an equitable claim to the fund superior to that which it is admitted the appellants have? Is it because of the accident that the railroad company is insolvent, and the appellees are therefore unable to secure the payment of their wages from any other source? It was only to provide against apprehended insolvency of the company that the mortgages were executed at all. If the company was solvent, the appellants would have no great interest in the application of the earnings. They would be paid in any event. So with the appellees.
If then the company was solvent, there would certainly be no injustice in excluding the appellees from participating in the earnings, and as it is adjudged by this court that the appellants have a prima facie equitable claim to the earnings because of their liens upon the roads, and the appointment of the receiver, I presume it would not be insisted, if the company was solvent, that the appellees might perversely refuse to seek payment out of other property, and come into court as they have done, and demand payment out of this fund. We are then brought to this inevitable conclusion, that the rights of the appellees are not founded in law, equity, or contract, but spring out of the accident that the mortgagor is insolvent. Now it was to provide against that accident, and that alone, that the mortgages were made and accepted. Then we have the anomaly of a security perfectly good as long as it is not needed, but the moment it is needed to secure the mortgagee, *666 who loaned his money on the faith of it, it is decided that because the very contingency, the fear of which induced its execution and acceptance, has arisen it is useless.
Indeed, it is worse than useless in this contest. The appellants accepted a security; the law, as I have attempted to show, attached certain incidents to that security; the appellees had no security; the crash came, and the party secured, or attempted to be secured, is postponed entirely until the creditor who was not secured by a contract or constructive lien, is paid in full out of the earnings of the property in lien to the other. Truly if such be the law, it is a misfortune to be secured.
It would be a great hardship upon the appellees to lose the wages due them for their sweat and toil; but hardships never create equities. The chancellor is not a dispenser of grace. He is bound to recognize the legal, the equitable, and the contract rights of suitors. He must be governed by principle, and dare not yield to the promptings of sympathy, and warp the rules established by a long line of precedents to do what seems to him equitable, unless he can base his decision upon principles which will establish the case as an exception to general rules. The mere discretion of a court, however learned, wise, and virtuous, unless that discretion be guided by principles that may be tested, understood, and followed, is a power too dangerous to the contract rights of citizens to be allowed to occupy a place in the temple of Justice. “ That law is best which leaves as little as possible to the mere discretion of the judge,” is one of Lord Bacon’s wisest aphorisms.
Courts dare not undertake to do, in defiance of the rules of law, what the individuals composing them may regard as abstract justice. When we speak of the administration of justice we do not mean justice in the abstract, justice according to the refinements of the mere casuist, but justice according to law.
*667 We have seen that the law made it the duty of the chancellor to appoint a receiver. That he did, and that far justice was done according to law.
We have also seen that the law, as settled in numerous cases, decided by American and English courts, entitles the appellants to the earnings of the mortgaged property while in the hands of a receiver appointed on their motion.
But they have been deprived of that right by the order of the vice-chancellor, which order is affirmed by the majority of this court, and the fund has been ordered to be paid to the appellees, who have no lien upon it, and no agreement to be paid out of it; who had no agency in intercepting it and keeping it out of the hands of the company, where, for all that we know, it would have been squandered or misapplied, as previous earnings had been, and who incurred no cost, no risk, and no trouble in securing it; who had notice of appellants’ liens upon the property, and who do not pretend to have a contract which, even as between them and their employer, the company, would give them a specific claim upon the road or its earnings.
But it is said the appellants seek equity, and according to the approved maxim that “he who seeks equity must do equity,” it was not inequitable to give the appellees the fruits secured by the vigilance of the appellants in the use of their own remedy at their own expense, and that, too, although the appellants, according to the authorities I have quoted, have a specific lien on the earnings in the receiver’s hands, and, as held by the majority of this court, an equitable claim which must prevail over all others who do not make out a superior claim.
I am not aware that this most excellent maxim has ever before been applied to a case like this. It is not pretended that the appellants owed any equity to the mortgagor. The company was in no condition to invoke the maxim or to ask lenience at the hands of the chancellor. It had violated every *668 important stipulation in the mortgages; had misapplied the earnings; had failed to pay current interest; had allowed state and municipal taxes assessed against it to be in arrear; the road to be out of repair; and, by failing to pay its employees, had excited them to mutiny, threatening the destruction of the road. They owed the appellees no equity. They neither employed them nor promised to pay them, and some of the appellees who have been ordered to be paid are the president and other officers of the unfaithful corporation, who may be presumed to be responsible for the mismanagement, not to say the bad faith, which led to the wholesale violations of the covenants in the mortgages to which I have referred.
As, therefore, the appellants owed no equity to the corporation, or to the appellees, the effect of the application, in this case, of the maxim “He who seeks equity must do equity” is that if A ask the intervention of the chancellor in his behalf against B, the chancellor may, as the condition upon which he will grant the relief asked, require A to render to C an equity due him from B. In other words, and to apply the principle announced to the case in hand, the company owes to the appellants and the appellees each a debt. It has given the appellants mortgages upon its property to secure the debts due to them, but the appellees have no lien. The appellants, because of their lien on the property, have a remedy which enables them to intercept its earnings, while the appellees, having no lien, have no such remedy. The appellants brought their suit, manifested their rights, and sought and obtained their remedy; and then it is said they must do equity; that is, they have no right to complain of the appropriation of those earnings which they intercepted, and which the appellees could never have reached, to pay the appellees’ debts.
I suppose the maxim in question means that a party seeking the aid of equity must do equity to him against whom he asks relief in reference to the subject-matter involved in the litiga *669 tion, and that it does not mean that he must do equity to all the world beside, and especially that it does not mean that a plaintiff seeking equity must answer for an equity not due from him but due from his adversary to a third person. If A has an unfair advantage of B, and comes into equity for relief against B respecting the matter to which such advantage appertains, the chancellor will apply the maxim, and compel A to relinquish his unjust advantage, or, if he refuses, will turn him out as unworthy of the aid of a court of conscience.
But if instead of having that advantage of B, against whom he seeks relief, he has it of C, against whom he seeks no relief, it will hardly do to say that A can be denied, relief unless he will do equity to C. Yet that case would be far stronger than this. The appellants have no unfair advantage of any one, unless, indeed, the taking of a mortgage security is to be held an unfair advantage of subsequent credits with notice. The appellants owe appellees nothing, and seek no relief against them, and the equity the appellees have is no greater than that which all unsecured creditors have to be paid out of the rents and profits of mortgaged property in the hands of a receiver pending proceedings to enforce the lien of the mortgagee.
But it is intimated that there is something peculiar in the nature of this case, and that the principles applicable to ordinary mortgages is not altogether applicable here.
This view was urged upon the court in Ellis v. Boston, Hartford & Erie Railroad Co. (107 Mass. 1) by very eminent counsel, but elicited no response from the court.
In Denniston v. Chicago, Alton & St. Louis R. R. Co. (4 Bissell, 416) several unsecured judgment creditors of the corporation petitioned to be paid out of funds in the hands of a receiver in a foreclosure suit. The debt of one of them was for such articles as were indispensable to the operations of the road. But the court rejected their claim and said: “It was precisely like the case of a man who furnishes to the owner *670 of a farm the means of carrying it on; but there is another party who has a lien upon that farm, and it is sold in order that the party who has the prior lien may be paid.” Again the court said: “ These parties ought to be paid. They have a just claim against this road. But it is against an insolvent corporation, and they ask parties who have a prior right and lien to pay them because those with whom they have dealt can not do so.”
So in this case. These appellees ought to be paid, and it may be that under the circumstances of this case the bondholders ought to have consented that they should be paid, but they saw proper to act otherwise, and in my opinion they had a lawful right to do so, and the courts have no right, consistent with either principle or authority, to compel them to pay that they do not owe, or to allow it to be paid out of money which upon well established rules of equity belongs to them.
The rights of parties and of strangers and the jurisdiction powers and duties of courts of equity are the same in suits to foreclose railroad mortgages as in other foreclosure suits. (High on Receivers, sec. 376.)
But if the chancellor had greater powers and a broader discretion in this class of cases than in suits to foreclose mortgages upon other descriptions of property, he still had no power to appropriate these earnings. If he had a right to impose terms upon the appellants as the condition upon which he would grant the relief they asked, or upon which he would continue the roads in the hands of the receiver, he should at least have allowed the appellants the election to submit to the terms he thought proper to impose, or go out of court and seek redress in some other mode.
I have endeavored to show that the mortgagees have liens on the earnings of the property while in the hands of the receiver, by express contract, and that the chancellor was bound to enforce those contracts as made if it could be done; and if *671 not, that he should then have enforced so much of them as was enforceable. He could not specifically execute several contracts for the delivery of one entire thing to each of several individuals at one and the same time, but he could and properly did take it into the custody of his receiver, and when he did so Douglass at least had, by the express terms of his contract, a right to have the earnings applied to the mortgage debts.
I have also endeavored to show that, by the well established rules of equity, mortgagees have a lien on the earnings of mortgaged property which come to the hands of a receiver pending a suit for a foreclosure and sale, and that the earnings are a part of their security of which the chancellor has no power to deprive them; that it was his duty to appoint a receiver when applied to for the purpose, it appearing that the conditions of the mortgage had not been performed, and that the property was probably an insufficient security; and that, having appointed the receiver, the mortgagees as matter of law became entitled to have the earnings applied toward the payment of the mortgage debts; and that it is a right over which the chancellor has no rightful power of disposition, and which he was as much bound to respect and enforce as he will be to respect and enforce their right to a foreclosure and sale and to the proceeds of the sale.
I have attempted to prove that those who loaned their money on the faith of their contract to have a certain security, and the well understood and universally recognized incidents to it, have claims upon the courts for the enforcement of their rights under and incident to their contracts as made.
As a judge, it is neither my duty nor my right to look to the consequences of my decision, further than the anticipated consequences may furnish reasons to confirm or to weaken convictions as to what the rule of law really is.
I have been unable to discover the line that is to separate the claim of the appellees from the claim of other unsecured *672 creditors. Nor am I able to discern the principle that is to distinguish the claim of the employees of a railroad company to be paid in preference to mortgagees from the claim of any other class of laborers to be paid in like manner out of mortgaged property upon which they have bestowed labor for which they have not been paid.
If these appellees have an equity to be paid out of the earnings in the receiver’s hands for labor done before his appointment, because they bestowed their, labor on the road and thereby kept it up, why shall not the material man who furnished articles indispensable to the operating of the road be paid also ? If the men who furnished necessary material are entitled to be paid, upon what principle of law or morals shall the man who furnished money to make cash purchases be refused ? And if all these are to be paid out of the earnings to the exclusion of the mortgagees, there will remain no debts to be paid but the mortgage-debts, and these being postponed to all others it will result that the only persons not secured are those who alone had taken security for their debts.
I am, for these reasons, of the opinion that the order of the vice-chancellor should be reversed.